THE PEOPLE OF PUERTO RICO, Plaintiff and Appellant, *v.*
ALBERTO CÁDIZ COLÓN, Defendant and Appellee.

No. 16996. Decided November 10, 1961.

J. B. Fernández Badillo, Attorney General of Puerto Rico, and Héctor R. Orlandi Gómez, Assistant Attorney General, for appellant. Héctor Martínez Colón for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo and Mr. Justice Dávila.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

In the prosecution for murder in the first degree brought in the Ponce Part of the Superior Court against Alberto Cádiz Colón,[1] the district attorney offered the testimony of witnesses María Mercedes Pietri, José García Medina, Benigno Coti Torres, and José Ramírez García. In January 1953, he was convicted of murder in the second degree and sentenced to serve from 10 to 15 years in the penitentiary. For the purposes of passing upon the only question raised in this appeal, it is necessary to sum up the testimony given by those witnesses.

*María Mercedes Pietri*, alias "La Colorá," testified that she knew the defendant and Petra Ramírez, the latter's "wife," who lived in the ward of Chichamba of Ponce; that on July 30, 1950 she went to the house of Ramírez in the company of José Ramírez García, known as Pepe Coca-Cola, to buy rum; that after the liquor was sold to them they remained in the yard of the house; that she saw when Cádiz beat Petra Ramírez and then "he sprinkled her with kerosene and set her afire"; that he took a "gallon" from a stove, which she identified at the district attorney's request,

---

[1] Another codefendant, Ramón Cádiz Colón, was acquitted by the jury upon proper instructions transmitted by the trial judge. The defense petition was based on insufficiency of the evidence to connect the codefendant with the wrongful acts charged.

which the witness had taken to police headquarters. On cross-examination she testified that before the occurrence of the assault the defendant and the victim had engaged in an argument over "jealousy"; that after the brawl the house was closed and "smoke came out" which smelled of burnt meat; that the defendant stated that he would take vengeance upon anyone who denounced him; that the door was forced open and they entered the house to aid the victim, whom they wrapped in a bedspread, which was also identified; that she gave testimony before the district attorney the same day of the occurrence and her account was identical with that given at the trial. *José García Medina* testified that he witnessed a row between the defendant and the deceased, who had been drinking; that he did not hear the defendant threaten his wife; and that he was not present when "she was burned." *Benigno Coti Torres*, state policeman, reproduced certain statements which the victim made to him when she was confined in Tricoche Hospital; "that these two men had set her on fire; that the husband had landed her a blow and she fell to the floor, and that he picked up a gallon of kerosene from the stove, sprinkled her with it, and set a match to her"; that she made these statements to him without the presence of the defendants at her first opportunity to talk with the witness in the course of the investigation; that the only persons who had talked with the victim were the defendants; that when he apprehended the defendants and informed them of the transcribed statements, they remained silent. The last witness, *José Ramírez García*, asserted that Cádiz and the Ramírez woman had a "row which came to blows"; that the defendant beat the victim and knocked her down; "then he picked up the gallon from the stove and sprinkled her and set a match to her"; that he also stated that he would kill anyone who "goes against me"; that he testified before the district attorney in terms similar to those of his testimony in court.

In April 1954, Cádiz filed in the trial court a petition which he labelled coram nobis challenging the judgment rendered. He adduced as grounds lack of due and adequate assistance of counsel and that the conviction was obtained by the testimony of "witnesses who were not at the scene of the occurrence." The petition was denied and the court stated, among other things, that the petitioner had failed to establish that the evidence of The People was fraudulent.

Again, in October 1955, the defendant moved to set aside the judgment on the ground that the testimony of witnesses María Mercedes Pietri and José Ramírez García was false. To that end he enclosed a sworn statement by the said witness [2] and a copy of the sworn statement given by Ra-

---

[2] The said sworn statement reads as follows:

"SWORN STATEMENT

"I, MARÍA MERCEDES PIETRI RUIZ, of full age, single, and a resident of Ponce, Puerto Rico, under oath declare:

"That my name is María Mercedes Pietri Ruiz, that I am of full age, single, and a resident of Ponce, Puerto Rico.

"That I freely and spontaneously declare what I witnessed, without being compelled, nor threatened, nor intimidated by anyone.

"That I live in the ward of Ponce known as Chichamba.

"That I wish to declare the truth in connection with the case of Alberto Cádiz, who is serving a sentence from 10 to 15 years in the Penitentiary.

"That when the case was tried, I testified that I saw Alberto Cádiz when he set fire to Petra Ramírez Letry.

"That I so declared because Pepe Coca-Cola threatened me and said to me that if I told the truth the district attorney would send me to the Penitentiary for five years.

"That everything I testified at the trial against Alberto Cádiz was a lie.

"That the whole truth in connection with the death of Petra Ramírez Letry is as follows:

"That when Petra Ramírez Letry set herself on fire, Alberto Cádiz was not in the house.

"That no one saw how she set herself on fire, and that it is not true that Alberto Cádiz sprinkled kerosene over her body and set fire to her.

"That everything I declare today is the truth and I do so in order to clear my conscience."

mírez on August 1, 1950, in the course of the preliminary investigation.[3] There was also offered a copy of the transcript of the testimonies given at the trial.

█ The trial court, without holding a pretrial conference, set aside the judgment rendered and ordered a new trial. It fixed bail to the defendant at $5,000, which was furnished, and the defendant has since then been out on bail. From the order issued we quote the pertinent part which we must consider in order to pass upon the attack made by The People against said order within the present petition for appeal.[4] It said that "it does not appear from the record that witness José Ramírez García gave another statement in addition to that given on August 1, 1950," [5] and that evidently that witness did not tell the truth in the course of the trial of the case when he testified that the account which he was giving of the occurrence "was the same which he had given

---

[3] The sworn statement of witness Ramírez reads:

"SWORN STATEMENT OF JOSÉ RAMÍREZ GARCÍA

"In Ponce, Puerto Rico, on this 1st day of August 1950, I, José Ramírez García, a resident of Ponce, Puerto Rico, in the ward of Machuelo Arriba, 26 years of age, appear before the district attorney and upon the legal warnings have been made to me spontaneously declare under oath:

"That on Sunday, July 30, 1950, between 11 and 12 o'clock in the morning, I was riding on a bicycle carrying some groceries and when I passed by the front of the house of Petra Ramírez Letrí in the ward of Chichamba in Ponce I saw a crowd of people. That since I could not get through with the bicycle because of the crowd of people, I stopped and saw Mrs. Petra Ramírez Letrí who had a sheet wrapped over her, and she called me and said: 'Look here, my son, help me get out to the street.' Then I went to her rescue and helped her get out, and noticed lacerations on the feet and on one hand. That I did not see who set fire to her, nor how it happened, nor did I see around there the man who is supposedly her husband. That Mrs. Ramírez Letrí did not make any statements in my presence as to the author of those burns, nor how they were caused.

"That what I declare is the truth and nothing but the truth."

[4] In People v. Zavala, 78 P.R.R. 461 (1955), we held that The People may appeal from an order granting a motion to set aside the sentence within a period of five days.

[5] It referred to the sworn statement given in the course of the preliminary investigation which we copied in the preceding footnote.

to the district attorney." It added that "in this case witness José Ramírez García has not confessed that he committed perjury. Witness María Mercedes Pietri confessed in her testimony that she had committed perjury. That statement, standing alone, is insufficient by itself to enable the court to set aside a judgment on the ground that it was obtained by fraud. The alleged perjury committed by José Ramírez García, standing alone, would also be insufficient to set aside the judgment. However, the fact that this witness admitted that he committed perjury when testifying in this case, coupled with the fact of apparent perjury which exists by reason of the clear contradiction between the account which he gave at the trial and the sworn statement given before the district attorney, points to the possibility that if the jury had known these facts it would have reached a different verdict as to the innocence or guilt of the defendant." Finally, it based the annulment of the judgment on the ground of fraud committed by witness Ramírez which, if it had been known at the time of the trial, would have necessarily influenced the verdict of the jury. In other words, the order discarded completely the retraction of witness Pietri and was based exclusively on that of witness José Ramírez García.

In *People* v. *Gerena*, 72 P.R.R. 211 (1951), we admitted the power of the courts, subject to certain recognized limitations, to set aside their judgments whenever they have been obtained by fraud. However, we expressly stated that the perjured testimony of a witness, standing alone, is no basis on which to set aside a judgment. *Román* v. *Warden*, 78 P.R.R. 730, 732 (1955). A further showing is necessary, *i.e.*, a deliberately planned and carefully executed scheme to defraud the court. To hold otherwise would be tantamount to admitting the sufficiency of another statement of the witness retracting the testimony given at the trial, seeking a new opportunity for the purpose of elucidating the defendant's criminal responsibility. It is also necessary to plead

and prove that the evidence of fraud could not have been discovered by reasonable diligence prior to the entry of the judgment, *People* v. *Soto*, 73 P.R.R. 52 (1952) ; *cf. People* v. *Cruzado*, 74 P.R.R. 872 (1953).

■ The facts of this case do not warrant the setting aside of the judgment, since it was not established that there was a deliberately planned and carefully executed scheme to defraud the court. The record reveals only a probable inconsistency between the testimony of witness Ramírez and that given on August, 1, 1950, in the course of the preliminary investigation conducted by the district attorney. This fact was not sufficient by itself to set aside the judgment. Furthermore, it clearly appears that the basic fact on which the order challenged is founded—"it does not appear that the witness . . . gave another statement in addition to that given on August 1, 1950"—is not correct, since the prosecution attached to its motion for reconsideration of the order setting aside the judgment copy of another statement given by that witness during the reinvestigation of the case in October 1950, when the victim died, which is substantially the same as that given in the course of the prosecution.[6]

---

[6] The said statement reads as follows:

"SWORN STATEMENT OF JOSÉ RAMÍREZ GARCÍA given on October 16, 1950, before HON. SALVADOR VERAY BARREDA, Assistant District Attorney of the District Court of Puerto Rico, Ponce Part.

"DISTRICT ATTORNEY: (Hon. Salvador Veray Barreda)
 Your name is?
WITNESSS:
 José Ramírez García.
Raise your right hand. Do you swear to tell the truth?
 Yes, sir.
On July 30, 1950, did you go to the house of Petra Ramírez Letrí and Alberto Cádiz Colón?
 Yes, sir.
At what time did you arrive there?
 I do not know the time more or less, Mr. District Attorney. Sometime between nine and ten in the morning, more or less.
What persons were there when you arrived?
 Mayoral, that chap I am telling you about.

For some unexplained reason the trial court disposed of the motion for reconsideration by merely saying "Motion Denied." Under these circumstances, witness Ramírez did not lie when he said that the testimony which he gave at the trial was in the same terms as another statement which he gave before

---

Do you refer to Mayoral, a dormitory guard who is committed to the District Jail?

Yes, sir.

Was he there?

Yes, sir; when Santos Colón was there.

Who else was there? Was Ramón Cádiz there?

I believe so.

Was Ramón Cádiz there and was he there with his wife Rosa?

I believe he was.

Was the brother of Alberto Cádiz there or not?

Yes, sir, he was.

Was Ramón's wife there?

She was with him.

Was Petra there?

Yes, sir, she was there.

And this, la Bocao, was she there?

She was there.

This girl María Mercedes, was she there?

She was there.

What was the argument about, if there was one, between Alberto Cádiz and Petra?

Well, I don't know what the argument was about, Mr. District Attorney. I don't know if he was jealous and did not trust her, or if she did not love him.

Is it true or not that Alberto was jealous of this fellow Maguán, a lame fellow who used to go there to get food for pigs?

Yes, sir.

Was that what the argument between Alberto and Petra was about?

Yes, sir.

What happened during that argument?

When it was going on, I was having a drink and saw the row.

Did Alberto strike her first with the fist?

Yes, sir, and he knocked her from the kitchen into the parlor with the first blow; after that he sprinkled the kerosene over her and set her afire.

Did Ramón, Alberto's brother, strike Petra?

No, sir, he did not strike her.

But was he there all the time?

He was there.

How did it happen that Alberto sprinkled her with kerosene and set a match to her?

the district attorney. In the field of conjecture we may say that the statement given on August 1, shortly after the occurrence, in which Ramírez states that "I did not see who set fire to her, nor did I see around the man who is supposedly her husband," was probably due to the threats proffered by the defendant against any person who accused him.

In the midst of the squabble it seems that she wanted to leave the house and he sprinkled her with kerosene.

Where did he take the kerosene from?

From the small stove.

Did he sprinkle her with the tank of the stove?

Yes, sir, then he put his finger on the small spout coming out of the hole of the small tank and sprinkled her.

Where was Petra when that happened?

In the kitchen.

Was anyone holding her when he sprinkled her with the kerosene?

No, sir.

Was not Ramón Cádiz holding her when he sprinkled her with the kerosene?

No, sir, because he threw her to the floor upon the first blow.

After he sprinkled her with the kerosene, what did he do?

After he sprinkled her with the kerosene, he set a match to her.

As soon as she caught fire, what did he do?

He went crazy as soon as she caught fire.

Who aided her there?

I helped to take off her clothes, and this young man who is in prison here, Mayoral; and that girl who was here also.

La Bocao?

Yes, sir, and I do not recall the other neighbors around there.

Do you know Minga, the rosary woman?

I know her by sight, but I do not know her personally. I guess she was the one who was saying the rosaries that night.

Are you absolutely sure that Ramón Cádiz, Alberto's brother, was there?

Yes, sir.

And you saw the brother sprinkle the kerosene and set a match to Petra?

Yes, sir.

Have those people talked with you after the occurrence?

No, sir.

Has any one of them threatened you if you said anything about the occurrence?

The one who is in prison said that when he came out he would kill anyone who was a witness.

Did he tell you that personally?

No, he said that in the ward.

 In fact, the effect as to the judgment of the defendant's motion is to obtain a new trial. Considering the motion made as a motion for a new trial, the same should be denied on the ground that it is not based on any of the causes prescribed by § 303 of the Code of Criminal Procedure (34 L.P.R.A. § 883).[7] *People* v. *Serbiá,* 78 P.R.R. 730 (1955); *People* v. *Reyes,* 76 P.R.R. 277 (1954); *People* v.

---

Did he say that the same day?
　Yes, sir, the same day.
That he would kill anyone who testified against him?
　Yes, sir.
Was he drunk?
　He had had several drinks. I told you about Santos Colón, this young man Mayoral. Mayoral was the one who helped take off her clothes in order to protect her. Then, after that he took the kerosene tank and put it back on the stove.
Do you swear that all of that is the truth and nothing but the truth?
　Yes, Mr. District Attorney.
And when this man sprinkled the kerosene over her, did you not say anything to him?
　I did not say anything to him because I was out of the house, and when he landed the blow and knocked her down, that she said, 'you are not going to leave me,' then he sprinkled her with the kerosene.
Did he say anything as he sprinkled her with the kerosene?
　No, sir, he was drunk when he did it; he did not say anything.
Do you wish to declare anything else that I have not asked you?
　I do not recall anything else.
Then that's all."

[7] Reference was made in the motion to the discovery of new evidence consisting of the testimony of nurse María Cristina Fernández regarding an alleged dying statement made by the victim, and of Dominga Chamorro and Dominga Torres in connection with the statements exonerating the defendant made by the deceased contemporaneously with the occurrence of the acts. The motion does not allege that the evidence in question could not be discovered prior to the trial with reasonable diligence, *People* v. *Beltrán,* 73 P.R.R. 466 (1952), since it only alleges that these facts were not submitted to the court for its consideration "for reasons which are not determinative of culpability nor negligence on the part of the defendant because they were not known to him." *Cf. People* v. *Díaz,* 5 P.R.R. 415 (1904); *People* v. *León,* 14 P.R.R. 242 (1908). Moreover, the effect of these testimonies would be merely to impeach the statement of agent Coti, *People* v. *Ortiz,* 68 P.R.R. 632 (1948), and there were not enclosed copies of the sworn statements of these witnesses to enable the court to determine whether they were sufficient to alter the verdict brought by the jury, *People* v. *Ramírez,* 50 P.R.R. 224 (1936).

*Vega*, 69 P.R.R. 376 (1948); *cf. People* v. *Ruiz*, 79 P.R.R. 902 (1957); *State* v. *Kicak*, 168 N.E.2d 768 (Ohio 1959). See, also, annotations in 158 A.L.R. 1062 (1945); 74 A.L.R. 757 (1931); and 33 A.L.R. 550 (1924).[8]

The order issued by the Superior Court, Ponce Part, on June 27, 1957, will be reversed and the case remanded for further proceedings.

---

[8] In the federal criminal prosecution it has been held—in connection with motions to set aside a sentence made under § 2255 of Title 28 of the United States Code—that in order that the impeachment of a sentence on the ground of fraud may be maintained, it is necessary to allege and show that the government officials or the district attorney knew that the testimony was perjured, *Black* v. *United States*, 269 F.2d 38 (C.A. 9, 1959), *cert. denied*, 361 U.S. 938 (1960); *Elliot* v. *United States*, 268 F.2d 135 (C.A. 8, 1959); *Kyle* v. *United States*, 266 F.2d 670 (C.A. 2, 1959), *cert. denied*, 361 U.S. 870 (1959); *cf. In re Carvelo's Petition*, 352 P.2d 616 (Hawaii 1959), and that it is likewise untenable when the defendant knew that such testimony would be given, but he did not bring out its falsity during the trial, *Taylor* v. *United States*, 229 F.2d 826 (C.A. 8, 1956), *cert. denied*, 351 U.S. 986 (1956).